IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| LATOYA JONES<br>8650 Neuse Landing Ln<br>Unit 108<br>Raleigh, North Carolina 27616 | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | **COMPLAINT FOR DAMAGES** |
| DURHAM CRISIS RESPONSE CENTER<br>101 E. Morgan St.<br>Durham, North Carolina 27701 | ) <br> ) <br> ) <br> ) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| **Serve Also:**<br>DURHAM CRISIS RESPONSE<br>CENTER<br>c/o Betty Wolf, registered agent<br>206 N. Dillard St.<br>Durham, North Carolina 27701 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Defendant | ) | |

Plaintiff, Latoya Jones, by and through undersigned counsel, as her Complaint against

Defendant, states and avers the following:

## PARTIES

1. Jones is a resident of the city of Raleigh, county of Wake, state of North Carolina.

2. Durham Crisis Response Center is a non-profit corporation that is incorporated in North Carolina.

3. Durham Crisis Response Center was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 2000e *et seq.*

4. Durham Crisis Response Center was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 12101 *et seq.*

5. Durham Crisis Response Center was at all times hereinafter mentioned an employer within the meaning of 29 U.S.C § 2601 *et seq.*

## JURISDICTION & VENUE

6. Durham Crisis Response Center hires citizens of the state of North Carolina, contracts with companies in North Carolina, and owns or rents property in North Carolina. As such, the exercise of personal jurisdiction over Durham Crisis Response Center comports with due process.

7. The wrongs herein alleged occurred at Durham Crisis Response Center facilities located in Durham County and were perpetrated by Durham Crisis Response Center and its employees working at its facilities located in Durham County. As such, this Court has personal jurisdiction over Durham Crisis Response Center.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1341 in that Jones is alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act, 29 U.S.C § 2601 *et seq.* ("FMLA"), and 42 U.S.C. § 1981.

9. Venue is proper in this District because the wrongs herein alleged occurred in this District.

## ADMINISTRATIVE PROCESS

10. Within 180 days of the conduct alleged below, Jones filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 433-2025-02760 against Durham Crisis Response Center ("Charge of Discrimination").

11. On or about November 28, 2025, the EEOC issued and mailed a Notice of Right to Sue letter to Jones regarding the Charge of Discrimination.

2

12. Jones received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5 and 42 U.S.C. § 12117(a), a copy of which has been attached hereto as Plaintiff's Exhibit A.

13. Jones has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

14. Jones has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1601.28.

## TITLE VII COVERAGE

15. At all times referenced herein, Durham Crisis Response Center was an "employer" within the meaning of 42 U.S.C. § 2000e(b), in that it was engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

16. At all times referenced herein, Jones was an "employee" within the meaning of 42 U.S.C. § 2000e(f), in that she was an individual employed by an employer.

## ADA COVERAGE

17. At all times referenced herein, Durham Crisis Response Center was an "employer" within the meaning of 42 U.S.C. § 12111(5), in that it was engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

18. At all times referenced herein, Jones was an "employee" within the meaning of 42 U.S.C. § 12111(4), in that she was an individual employed by an employer.

## FMLA COVERAGE

19. At all times referenced herein, Durham Crisis Response Center was an "employer" within the meaning of 29 U.S.C § 2611(4), in that it was engaged in commerce and employed fifty or more employees for each working day during each of twenty or more calendar workweeks in

3

the current or preceding calendar year.

20.  At all relevant times referenced herein, Jones was an "eligible employee" within the meaning of 29 U.S.C § 2611(2), in that she was employed by Durham Crisis Response Center for at least twelve months and had been employed for at least 1,250 hours of service with Durham Crisis Response Center during the preceding twelve-month period.

## FACTS

21. Jones is African American.

22. Jones has been diagnosed with major depressive disorder since around 1999.

23. Jones's depression is a mental impairment that substantially limits major life activities.

24. The major life activities that are limited by Jones's depression include the ability to think, concentrate, and interact with others.

25. Jones has been diagnosed with panic attacks since around 1998.

26. Jones panic attacks are a mental impairment that substantially limit major life activities.

27. The major life activities that are limited by Jones's panic attacks include the ability to think, concentrate, and interact with others.

28. Jones has been diagnosed with anxiety since about 1999.

29. Jones's anxiety is a mental impairment that substantially limits major life activities.

30. The major life activities that are limited by Jones's anxiety include the ability to think, concentrate, and interact with others.

31. Jones has been diagnosed with attention deficit hyperactivity disorder ("ADHD") since around 2023.

32. Jones ADHD is a mental impairment that substantially limits major life activities.

33. The major life activities that are limited by Jones's ADHD include the ability to think,

concentrate, and interact with others.

34. Jones's depression, panic attacks, anxiety, and ADHD are each and separately disabilities under the ADA ("Disabilities").

35. Durham Crisis Response Center hired Jones on or about September 6, 2006.

36. Jones was hired for the position of Case Manager.

37. Jones excelled as Case Manager.

38. On or around July 1, 2020, because of Jones's excellent work as Case Manager, Jones was promoted to Shelter Manager.

39. In From October 2023 to January 2024, Jones was on approved medical leave related to her Disabilities ("2023 Medical Leave").

40. Jones submitted her 2023 Medical Leave request for medical leave to Heather Holland, who worked in human resources, Carolyn Moore, who was at all relevant times a member of the Durham Crisis Response Center Board of Directors, Jimmie Anderson, who was at all relevant times a member of the Durham Crisis Response Center Board of Directors , Damien Talley, who was the executive director at that time, and Abdur Koway, who was the accountant at that time.

41. The Durham Crisis Response Center Board of Directors has the authority to hire, fire, and discipline Jones.

42. At all times relevant to this complaint, the members of the Durham Crisis Response Center Board of Directors included Moore, Anderson, Keith Bishop, Monica Burnette, and Florence Bowens.

43. In the 2023 Medical Leave request for medical leave that Jones submitted, Jones disclosed her Disabilities.

5

44. At the end of her 2023 Medical Leave, Jones returned to her role as Shelter Manager.

45. Jones's most recent performance review at Durham Crisis Response Center was conducted on or about August 23, 2024 ("August Performance Review").

46. The August Performance Review was an evaluation of Jones's work performance from July 23, 2023, to July 23, 2024.

47. Employee performance reviews at the Durham Crisis Response Center are conducted by the employee's supervisor using a DCRC Employee Evaluation Form.

48. The DCRC Employee Evaluation Form lists nine performance categories by which the reviewed employee's performance will be judged.

49. The performance categories listed on the DCRC Employee Evaluation Form are quality of work, attendance & punctuality, reliability/dependability, communication skills, judgment & decision-making, initiative & flexibility, cooperation & teamwork, knowledge of position, and training & development.

50. For each performance category listed on the DCRC Employee Evaluation Form, the reviewed employee's performance is rated as either unacceptable, needs improvement, meets expectations, or exceeds expectations.

51. In addition to the ratings given for each performance category, reviewed employees are given an overall rating of either unacceptable, needs improvement, meets expectations, or exceeds expectations.

52. The DCRC Employee Evaluation Form also provides space for the supervisor to add written comments elaborating on each performance category rating and the employee's overall performance.

53. Jones's August Performance Review was conducted by Valerie C. Merriweather using the

6

DCRC Employee Evaluation Form.

54. Merriweather is African American.

55. At the time Merriweather conducted the August Performance Review, Merriweather was Jones's supervisor.

56. On the DCRC Employee Evaluation Form that was used for Jones's August Performance Review, Merriweather rated Jones as exceeds expectations for six of the nine performance categories.

57. On the DCRC Employee Evaluation Form that was used for Jones's August Performance Review, Merriweather rated Jones's overall performance as meets expectations.

58. In the comment sections of the DCRC Employee Evaluation Form that was used for Jones's August Performance Review, Merriweather wrote the following glowing comments about Jones's performance:

    a. "Latoya is an excellent Shelter Manager. She supports clients with dignity and professionalism."

    b. "Latoya goes the extra mile to ensure that she's available for clients."

    c. "Latoya is consistent and reliable for shelter coverage."

    d. "Latoya identifies problems for the agency and offers solutions."

    e. "Latoya thinks of the clients first in her daily interactions."

    f. "Latoya is a subject matter expert and operates the shelter at a high level."

    g. "Latoya looks for opportunities to grow [and] increase her knowledge."

    h. "Overall, Latoya is a solid employee with expert knowledge on shelter operations."

59. Jones's previous performance evaluations over her near 20 years of employment with the Durham Crisis Response Center were similarly positive.

7

60. In addition to past positive performance evaluations, Jones was named employee of the quarter in 2023.

61. In September 2024, Jones was promoted to Shelter Director.

62. Jones's promotion to Shelter Director was only a change in title; Jones's responsibilities remained the same as the responsibilities she fulfilled as Shelter Manager.

63. Jones was qualified for the position of Shelter Director.

64. As a Shelter Director, Jones reported to the Executive Director.

65. In or around October 2024, Durham Crisis Response Center hired Shana Carignan as Executive Director.

66. Carignan is Caucasian.

67. Carignan had the authority to hire, fire, and discipline Jones.

68. As Executive Director, Carignan advised the Durham Crisis Board of Directors as to which employees should be terminated.

69. In or around November 2024, Carignan told Jones that she knew that Jones had taken medical leave for her Disabilities, referring to her 2023 Medical Leave.

70. Jones told Carignan that she does not feel comfortable talking to her about her mental health ("Objection to Carignan's Disability Comment").

71. Jones called Moore to complain about Carignan's comment regarding her medical leave and to ask Moore if she had disclosed to Carignan Jones's Disabilities or her previous medical leave ("Complaint About Carignan's Disability Comment").

72. Upon information and belief, Moore told Carignan about Jones's Complaint About Carignan's Disability Comment.

73. In or around November 2024, Carignan implied Jones fit the stereotype of an angry black

8

woman.

74. Jones objected to Carignan implying that Jones fit the stereotype of an angry black woman ("Objection to Stereotype Comment").

75. Jones raised her complaints regarding Carignan's racial discrimination to the Durham Crisis Response Center Board of Directors.

76. On or around January 22, 2025, Jones sent an email to the Durham Crisis Response Center Board of Directors complaining about the racism that Carignan was subjecting Jones to ("January 22 Complaint About Racial Discrimination").

77. In her January 22 Complaint of Racial Discrimination, Jones stated, "She [Carignan] made references insinuating that I'm an angry black woman. I have several emails and text messages with her stereotyping. I mentioned to Carolyn, how she's always saying that I'm angry when I'm not…I addressed that in the Directors meeting yesterday with Tammy present…Shana has issues with black men and strong black women."

78. Upon information and belief, Carignan was told about the January 22 Complaint About Racial Discrimination.

79. On or about February 19, 2025, Jones told Carignan she was experiencing elevated anxiety and blood pressure and was having difficulty sleeping.

80. Carignan told Jones that, if Jones went out on a mental health leave, she would replace Jones.

81. On or about February 20, 2025, Jones submitted a time off request form, requesting leave for the period of February 21, 2025, through March 24, 2025 ("Request for Reasonable Accommodation").

82. Jones's request for Reasonable Accommodations was granted.

83. On or about February 21, 2025, Jones began her medical leave ("2025 Medical Leave" and

"Reasonable Accommodation").

84. After Jones began her 2025 Medical Leave, Carignan put a padlock on Jones's office door.

85. No padlock was put on Jones's office door during her 2023 Medical Leave.

86. Carignan putting a padlock on Jones's office door was an adverse employment action.

87. Carignan put a padlock on Jones's office door because of Jones's race.

88. Carignan put a padlock on Jones's office door because of Jones's Disabilities.

89. Carignan put a padlock on Jones's office door because she perceived Jones as being disabled.

90. Carignan put a padlock on Jones's office door in retaliation for Jones's opposing disability discrimination, including her Objection to Carignan's Disability Comment and her Complaint About Carignan's Disability Comment.

91. Carignan put a padlock on Jones's office door in retaliation for Jones's opposing racial discrimination, including her Objection to Stereotype Comment and her January 22 Complaint About Racial Discrimination.

92. Carignan put a padlock on Jones's office door in retaliation for Jones's Request for Reasonable Accommodation.

93. Carignan put a padlock on Jones's office door in retaliation for Jones's using her Reasonable Accommodation.

94. After Jones began her 2025 Medical Leave, Carignan blocked Jones from accessing her emails.

95. Jones was not blocked from accessing her emails during her 2023 Medical Leave.

96.  Carignan blocking Jones from accessing her emails was an adverse employment action.

97. Carignan blocked Jones from accessing her emails because of Jones's race.

98. Carignan blocked Jones from accessing her emails because of Jones's Disabilities.

99. Carignan blocked Jones from accessing her emails because she perceived Jones as being

10

disabled.

100. Carignan blocked Jones from accessing her emails in retaliation for Jones's opposing disability discrimination, including her Objection to Carignan's Disability Comment and her Complaint About Carignan's Disability Comment.

101. Carignan blocked Jones from accessing her emails in retaliation for Jones's opposing racial discrimination, including her Objection to Stereotype Comment and her January 22 Complaint About Racial Discrimination.

102. Carignan blocked Jones from accessing her emails in retaliation for Jones's Request for Reasonable Accommodation.

103. Carignan blocked Jones from accessing her emails in retaliation for Jones's using her Reasonable Accommodation.

104. After Jones began her 2025 Medical Leave, Carignan changed the alarm code on the buildings that Jones oversees.

105. The alarm codes were not changed on the buildings that Jones oversees during her 2023 Medical Leave.

106. Carignan changing the alarm codes was an adverse employment action.

107. Carignan changed the alarm codes because of Jones's race.

108. Carignan changed the alarm codes because of Jones's Disabilities.

109. Carignan changed the alarm codes because she perceived Jones as being disabled.

110. Carignan changed the alarm codes in retaliation for Jones's opposing disability discrimination, including her Objection to Carignan's Disability Comment and her Complaint About Carignan's Disability Comment.

111. Carignan changed the alarm codes in retaliation for Jones's opposing racial discrimination,

11

including her Objection to Stereotype Comment and her January 22 Complaint About Racial Discrimination.

112. Carignan changed the alarm codes in retaliation for Jones's Request for Reasonable Accommodation.

113. Carignan changed the alarm codes in retaliation for Jones's using her Reasonable Accommodation.

114. After Jones began her medical leave, Carignan told other Durham Crisis Response Center employees that Jones was fired.

115. On or about March 2025, Carignan mentioned that she had performed a background check and made comments about the results of the background check that indicated the background check was performed on Jones.

116. Upon information and belief, Carignan did not perform a background check on any of the Caucasian employees of Durham Crisis Response Center.

117. Upon information and belief, Carignan did not perform a background check on any of the employees of Durham Crisis Response Center who did not have a disability.

118. Performing background checks was not one of the responsibilities assigned to the Executive Director.

119. The background check Carignan performed on Jones did not comply with the Durham Crisis Response Center's procedures for performing background checks.

120. Carignan performed a background check on Jones because of her race.

121. Carignan performed a background check on Jones because of her Disabilities.

122. Carignan performed a background check on Jones because she perceived Jones as being disabled.

12

123.  Carignan performed a background check on Jones because of Jones's opposing racial discrimination, including her Objection to Stereotype Comment and her January 22 Complaint About Racial Discrimination.

124.  Carignan performed a background check on Jones because of Jones's opposing disability discrimination, including her Objection to Carignan's Disability Comment and her Complaint About Carignan's Disability Comment.

125.  Carignan performed a background check on Jones because of Jones's Request for Reasonable Accommodation.

126.  Carignan performed a background check on Jones because of Jones's using her Reasonable Accommodation.

127.  On or about March 5, 2025, Anderson messaged Jones to state that the Durham Crisis Response Center would engage an independent third party to investigate the allegations that Jones had made against Carignan, which included her January 22 Complaint About Racial Discrimination and her Complaint About Carignan's Disability Comment.

128.  On or about March 16, 2025, Moore emailed Jones, stating, "We are beginning the HR investigation of the on-going grievances…Yvette Griffin is the HR consultant who will be conducting the investigation" ("Griffin Investigation").

129.  Griffin is African American.

130.  In the March 16, 2025, email, Moore instructed Griffin to contact Jones.

131.  On or about March 17, 2025, Jones met with Griffin to discuss her grievances as part of the Griffin Investigation.

132.  During her March 17, 2025, meeting with Griffin, Jones informed Griffin that Carignan was discriminating against her because of her race.

133.    During her March 17, 2025, meeting with Griffin, Jones informed Griffin that Carignan was discriminating against her because of her Disabilities.

134.    During her March 17, 2025, meeting with Griffin, Jones informed Griffin that Carignan was retaliating against her because of opposing discrimination, including Jones's January 22 Complaint About Racial Discrimination and her Complaint About Carignan's Disability Comment.

135.    During her March 17, 2025, meeting with Griffin, Jones complained to Griffin about the Durham Crisis Response Center's Board of Directors response to her complaints of discrimination.

136.    On or about March 21, 2025, Jones emailed Burnette, Bishop, Bownes, and Courtney Bunch, who was the shelter case manager, stating that "there are a lot of things that are being done out of retaliation that are illegal" and referencing Carignan's "racist comments" ("March 21 Complaint About Racial Discrimination and Retaliation").

137.    On or about March 21, 2025, Holland sent Jones a letter informing Jones that, "the Durham Crisis Response Center, with permission from the Board of Directors, has decided to place you on administrative leave effective today, March 21, 2025. This leave will remain in effect through the duration of the ongoing investigation" ("Administrative Leave Letter").

138.    The ongoing investigation referenced in the Administrative Leave Letter was the Griffin Investigation.

139.    Carignan was not placed on administrative leave during the Griffin Investigation, despite that the Griffin Investigation was regarding allegations made against Carignan.

140.    Jones was placed on administrative leave because of her race.

141.    Jones was placed on administrative leave because of her Disabilities.

14

142.    Jones was placed on administrative leave because she was perceived as being disabled.

143.    Jones was placed on administrative leave in retaliation for her opposing disability discrimination, including Jones's Objection to Carignan's Disability Comment and her Complaint About Carignan's Disability Comment.

144.    Jones was placed on administrative leave in retaliation for her opposing racial discrimination, including Jones's March 21 Complaint About Racial Discrimination and Retaliation and Jones's January 22 Complaint About Racial Discrimination.

145.    Jones was placed on administrative leave in retaliation for Jones's Request for Reasonable Accommodation.

146.    Jones was placed on administrative leave in retaliation for Jones's using her Reasonable Accommodation.

147.    On multiple occasions, Jones asked members of the Durham Crisis Response Center Board of Directors for a reason why she was being placed on administrative leave.

148.    Jones was never given a reason why she was placed on administrative leave.

149.    On or around April 8, 2025, Jones contacted Griffin to provide more information related to the Griffin Investigation.

150.    Griffin informed Jones that she had already submitted the findings of the Griffin Investigation to the Durham Crisis Response Center Board of Directors.

151.    Upon information and belief, Griffin emailed her findings to Moore and Tammy Donaldson, who handled general operations of the Durham Crisis Response Center and who was present at the Durham Crisis Response Center board meetings.

152.    Donaldson told another employee of Durham Crisis Response Center, Cheryl Geiger, that she was told by Moore to forget ever seeing it, referring to the findings of the Griffin

Investigation.

153. Donaldson told Geiger that the results of the Griffin Investigation included findings that Jones had been retaliated against and discriminated against.

154. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been discriminated against because of her race.

155. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been discriminated against because of her Disabilities.

156. information and belief, the findings of the Griffin Investigation showed that Jones had been discriminated against because of her being perceived as disabled.

157. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been retaliated against because of her opposing racial discrimination, including Jones's March 21 Complaint About Racial Discrimination and Retaliation and Jones's January 22 Complaint About Racial Discrimination.

158. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been retaliated against because of her opposing disability discrimination, including Jones's Complaint About Carignan's Disability Comment and Jones's Objection to Carignan's Disability Comment.

159. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been retaliated against because of her Request for Reasonable Accommodation.

160. Upon information and belief, the findings of the Griffin Investigation showed that Jones had been retaliated against because of her using her Reasonable Accommodation.

161. The Durham Crisis Response Center did not take any corrective action against Carignan in response to the findings of the Griffin Investigation.

162.   Instead of taking corrective action against Carignan in response to the findings of the Griffin Investigation, the Durham Crisis Response Center's Board of Directors hired a second consultant, Kena Cofield Jones, to conduct a second investigation ("Kena Investigation").

163.   The Kena Investigation was initiated to form a pretext for terminating Jones.

164.   In or around April 2025, Jones was tested for breast cancer.

165.   In or around April 16, 2025, Jones texted Moore that she was being tested for breast cancer.

166.   On or around April 17, 2025, Jones texted Moore, "they said it's more than likely cancer. I have to get a biopsy next week."

167.   On or about April 21, 2025, Jones emailed Bishop, Burnette, Bowens, Anderson, and Moore, stating, in reference to her possible cancer diagnosis, "I'm dealing with some severe, potentially life-changing issues right now. I need all the support I can get at this time. As an employee…in crisis, I'm asking for support from my company to allow me to return to work…Please at least give me some response because I genuinely need your support at this very critical time for me."

168.   On or around April 28, 2025, Jones was diagnosed with breast cancer.

169.   Breast cancer is a disability under the ADA.

170.   Breast cancer is a serious health condition under the FMLA.

171.   On or around April 28, 2025, Jones sent Moore a text saying, "Hey, I have it. It's not in my lymph nodes but they do not [know] what stage or form as of yet. They're still doing testing on the tissue but [I] for sure have it."

172.   In response to Jones's disclosure of her cancer diagnosis, the Durham Crisis Response Center did not provide Jones any information about her rights under the FMLA.

173.   At the time of her cancer diagnoses, Jones was qualified for FMLA leave.

174.    On or about May 6, 2025, Durham Crisis Response Center terminated Jones.

175.    Durham Crisis Response Center cited the findings of the Kena Investigation to support its reason for termination.

176.    The findings of the Kena Investigation that were cited by Durham Crisis Response Center to support its decision to terminate Jones directly contradicted the years of positive feedback and performance reviews that Jones had received, including the very recent August Performance Review.

177.    The findings of the Kena Investigation that were cited by Durham Crisis Response Center to support its decision to terminate Jones were based on false information given to Kena by Carignan.

178.    Jones's termination violated Durham Crisis Response Center's progressive disciplinary procedures.

179.    According to the Durham Crisis Response Center's progressive disciplinary procedures, an employee may be terminated voluntarily as a resignation, or involuntarily either as a reduction in force, for unsatisfactory performance, or for misconduct.

180.    Jones did not resign.

181.    Jones was not terminated as part of a reduction in force.

182.    According to the Durham Crisis Response Center's disciplinary policies that were in place at the time of Jones's termination, "[a] two-week advance, written notice will be given to an employee dismissed for unsatisfactory job performance."

183.    Jones was not given a two-week advance, written notice that she would be dismissed for unsatisfactory job performance.

184.    According to the Durham Crisis Response Center's disciplinary policies that were in place

at the time of Jones's termination, "[p]rior to termination for unsatisfactory performance, the immediate supervisor must make a reasonable effort to resolve the problem with the employee by following the disciplinary procedure."

185. According to the Durham Crisis Response Center's disciplinary procedures, the disciplinary procedures for resolving problems with an employee whose performance is unsatisfactory is issuing oral and written warnings.

186. Jones's immediate supervisor made no efforts to resolve any alleged problems with Jones through oral or written warnings.

187. According to the Durham Crisis Response Center's disciplinary policies that were in place at the time of Jones's termination, "before the employee can be terminated [for misconduct], [the] supervisor or Executive Director must inform the employee in writing of a one-week suspension with the intent to terminate."

188. Jones was not informed of the intent to terminate.

189. The stated reasons for Jones's termination were pretext.

190. Jones was terminated because of her race.

191. Jones was terminated because of her Disabilities.

192. Jones was terminated because of her cancer diagnosis, which qualifies as a disability.

193. Jones was terminated because of she was perceived as being disabled.

194. Jones was terminated in retaliation for her opposing racial discrimination, including Jones's March 21 Complaint About Racial Discrimination and Retaliation and Jones's January 22 Complaint About Racial Discrimination.

195. Jones was terminated in retaliation for her opposing disability discrimination, including Jones's Objection to Carignan's Disability Comment and Jones's Complaint About Carignan's

19

Disability Comment.

196.    Jones was terminated in retaliation for her Request for Reasonable Accommodation.

197.    Jones was terminated for her using her Reasonable Accommodation.

198.    Jones's termination interfered with her FMLA rights.

## COUNT I: <u>DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA</u>

199. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

200. Jones was qualified for her job at Durham Crisis Response Center.

201. Jones has been diagnosed with several Disabilities, including cancer.

202. Jones disclosed her Disabilities to the Durham Crisis Response Center Board of Directors.

203. Jones disclosed her Disabilities to Carignan.

204. Durham Crisis Response Center treated Jones differently than other similarly situated employees based on her Disabilities.

205. Crisis Response Center treated Jones differently than other similarly situated employees based on her perceived disabilities.

206. On or about May 6, 2025, Durham Crisis Response Center terminated Jones.

207. Durham Crisis Response Center terminated Jones based on her Disabilities.

208. Durham Crisis Response Center terminated Jones's employment because it perceived Jones to be disabled.

209. Durham Crisis Response Center terminated Jones's employment because of Jones's record of disabilities.

210. Durham Crisis Response Center violated the ADA by terminating Jones based on her disabilities.

211. Durham Crisis Response Center violated the ADA by terminating Jones based on its perception of Jones as disabled.

212. Durham Crisis Response Center violated the ADA by terminating Jones based on her record of disabilities.

213. As a result of Durham Crisis Response Center's discrimination in violation of the ADA, Jones has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Jones to injunctive and equitable monetary relief.

214. Jones has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

215. To remedy the violations of the rights of Jones as secured by the ADA, Jones requests the court award her the relief prayed below.

### COUNT II: <u>FAILURE TO ACCOMODATE IN VIOLATION OF THE ADA</u>

216. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

217. Jones requested a reasonable accommodation regarding her Disabilities.

218. Durham Crisis Response Center did not provide Jones with an accommodation.

219. Durham Crisis Response Center did not engage in an interactive accommodation process with Jones.

220. Durham Crisis Response Center's failure to provide Jones an accommodation or engage in an interactive accommodation process with Jones was a proximate cause of Jones's termination.

221. Durham Crisis Response Center's failure to provide Jones an accommodation or engage in an interactive accommodation process with Jones violated the ADA.

21

222. As a result of Durham Crisis Response Center's violation of the ADA, Jones has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Jones to injunctive and equitable monetary relief.

223. Jones has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

224. To remedy the violations of the rights of Jones as secured by the ADA, Jones requests the court award her the relief prayed below.

## COUNT III: <u>RETALIATION IN VIOLATION OF THE ADA</u>

225. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

226. Pursuant to 42 U.S.C. § 12112(b)(5)(A), requesting reasonable accommodations is a protected activity.

227. Jones engaged in a protected activity when she submitted her Request for Reasonable Accommodation.

228. Jones engaged in a protected activity when she opposed disability discrimination, including her Complaint About Carignan's Disability Comment.

229. Durham Crisis Response Center terminated Jones because of her Request for Reasonable Accommodations.

230. Durham Crisis Response Center terminated Jones because of her opposition to disability discrimination.

231. As a result of Durham Crisis Response Center's terminating Jones, Jones suffered damages including but not limited to lost wages.

232. In its actions as alleged above, Durham Crisis Response Center acted with malice or reckless indifference to Jones's rights, thereby entitling Jones to an award of punitive damages.

233. To remedy the violations of Jones's rights, secured by 42 U.S.C § 12101 *et seq.*, Jones requests that the Court award her the relief prayed for below

## COUNT IV: <u>RACE DISCRIMINATION IN VIOLATION OF TITLE VII</u>

234. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

235. Pursuant to 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice for an employer to discriminate against an employee "because of such individual's race."

236. Jones is African American.

237. For the entirety of Jones's employment with Durham Crisis Response Center, Jones was qualified for her position.

238. Jones's non-African American managers discriminated against Jones because of her race.

239. Durham Crisis Response Center terminated Jones because of her Race.

240. Durham Crisis Response Center violated Title VII by discriminating against and terminating Jones because of her Race.

241. As a result of Durham Crisis Response Center's discrimination, Jones suffered damages including but not limited to lost wages.

242. Jones has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

243. In its discriminatory actions as alleged above, Durham Crisis Response Center acted with malice or reckless indifference to Jones's rights, thereby entitling Jones to an award of punitive damages.

244. To remedy the violations of Jones's rights, secured by 42 U.S.C. § 2000e et seq., Jones requests that the Court award her the relief prayed for below.

## COUNT V: <u>RETALIATION IN VIOLATION OF TITLE VII</u>

245. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

246. Pursuant to 42 U.S.C. § 2000e-3, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter."

247. Jones opposed an unlawful employment practice when she complained about racial discrimination, including in her March 21 Complaint About Racial Discrimination and Retaliation and her January 22 Complaint About Racial Discrimination.

248. In response to Jones's opposition to unlawful employment practices, Durham Crisis Response Center retaliated against Jones.

249. As a result of Durham Crisis Response Center's retaliation, Jones suffered damages including but not limited to lost wages.

250. Jones has suffered severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

251. In its retaliatory actions as alleged above, Durham Crisis Response Center acted with malice or reckless indifference to Jones's rights, thereby entitling Jones to an award of punitive damages.

252. To remedy the violations of Jones's rights, secured by 42 U.S.C. § 2000e *et seq.*, Jones requests that the Court award her the relief prayed for below.

## COUNT VI: <u>RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981</u>

253. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

254. Durham Crisis Response Center violated Jones's rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

255. Durham Crisis Response Center, by denying Jones equal treatment to Caucasian employees and by terminating Jones, intentionally deprived Jones of the same rights as are enjoyed by Caucasian citizens to the creation, performance, enjoyment, and all benefits and privileges, of her employment relationship with Durham Crisis Response Center, in violation of Section 1981.

256. As a result of Durham Crisis Response Center denying Jones equal treatment to Caucasian employees and by terminating Jones in violation of Section 1981, Jones has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Jones to injunctive, equitable, and compensatory monetary relief.

257. As a result of Durham Crisis Response Center denying Jones equal treatment to Caucasian employees and by terminating Jones in violation of Section 1981, Jones has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

258. Durham Crisis Response Center's denying Jones equal treatment to Caucasian employees and terminating Jones in violation of Section 1981 was done with malice or reckless indifference to Jones's rights, thereby entitling Jones to an award of punitive damages.

259. To remedy the violations of Jones's Section 1981 rights, Jones requests that the Court award her the relief prayed for below.

## COUNT VII: <u>RETALIATION IN VIOLATION OF 42 U.S.C. § 1981</u>

260.  Jones restates each and every paragraph of this complaint as if it were fully restated herein.

261. Durham Crisis Response Center violated Section 1981 by terminating Jones because of her comments about and objections to what she reasonable believed to be racially motivated disparate treatment and discrimination against her because of her race.

262. As a direct and proximate result of Durham Crisis Response Center's unlawful retaliatory conduct in violation of Section 1981, Jones has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits for which Jones is entitled to an award of monetary damages and other relief.

263. As a direct and proximate result of Durham Crisis Response Center's unlawful retaliatory conduct in violation of Section 1981, Jones has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Jones is entitled to an award of monetary damages and other relief.

264. Durham Crisis Response Center's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Jones, and was done with conscious disregard of Jones's civil rights, entitling Jones to an award of punitive damages.

265. To remedy the violations of Jones's Section 1981 rights, Hones request that the Court award her the relief prayed for below.

## COUNT VIII: <u>FMLA INTERFERENCE</u>

266. Jones restates each and every paragraph of this complaint as if it were fully restated herein.

267. Pursuant to 29 U.S.C. § 2615(a)(1), "It shall be an unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

268. In or around April 2025, Jones informed the Durham Crisis Response Center's Board of Directors that she was diagnosed with cancer and would be receiving treatment.

269. At the time Jones informed the Durham Crisis Response Center's Board of Directors that she was diagnosed with cancer and would be receiving treatment, Jones was entitled to apply for and receive leave under the FMLA.

270. On or about May 6, 2025, Jones was terminated by the Durham Crisis Response Center's Board of Directors.

271. Jones was terminated to prevent her from taking FMLA leave.

272. Durham Crisis Response Center's termination of Jones interfered with her right to take FMLA Leave.

273. As a result of Durham Crisis Response Center's interference with Jones's right to take her Approved FMLA Leave, Jones suffered damages including but not limited to lost wages.

274. To remedy the violations of Jones's rights, secured by 29 U.S.C. § 2601 *et seq.*, Jones requests that the Court award her the relief prayed for below.

## **DEMAND FOR RELIEF**

WHEREFORE, Latoya Jones demands the following:

(a) An award against Defendant of compensatory and monetary damages to compensate Jones for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

27

(b) An award of liquidated damages in the amount of Jones's compensatory damages;

(c) An award of punitive damages against Defendant in an amount in excess of $25,000.

(d) An award of reasonable attorneys' fees and non-taxable costs for Jones's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Stephen Loelius, Esq.*

Stephen Loelius (62520)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
5540 Centerview Drive
Suite 200B
Raleigh, NC 27606
Phone: (984) 263-0486
Fax:    (216) 291-5744
Email: stephen.loelius@spitzlawfirm.com

*Attorneys For Plaintiff*
*Latoya Jones*

28

## **JURY DEMAND**

Plaintiff Latoya Jones demands a trial by jury by the maximum number of jurors permitted.

/s/ *Stephen Loelius*
Stephen Loelius, Esq. (62520)